**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gerald L. RICHARDS,
Defendant-Appellant.**

**No. 77–1603.**

United States Court of Appeals,
Tenth Circuit.

Argued May 8, 1978.
Decided Aug. 23, 1978.

---

Logan, Circuit Judge, filed a dissenting opinion.

Max D. Wheeler, Asst. U. S. Atty., Salt Lake City, Utah (Ronald L. Rencher, U. S. Atty., Salt Lake City, Utah, with him on the brief), for plaintiff-appellee.

Jackson B. Howard, Provo, Utah (Howard, Lewis & Petersen, Provo, Utah, with him on the brief), for defendant-appellant.

Before McWILLIAMS, BREITENSTEIN and LOGAN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Regulations of the Secretary of the Interior under the Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq., proscribe the sale of certain birds "whether or not raised in captivity." Defendant-appellant was charged with, and on a trial to the court found guilty of, the sale of three sparrow hawks, a protected species. The birds were raised in captivity. Defendant was sentenced to concurrent 18 month terms on each of three counts. On this appeal he attacks the validity and applicability of the pertinent statutes and regulations. We affirm.

The facts are not controverted. Sparrow hawks, scientific name falconidae, are migratory nongame birds often used in falconry. They are birds of prey and sometimes referred to as kestrel or raptors. Defendant became interested in raptors at an early age. During 1969 he acquired his first breeding hawks in Wisconsin under a valid state permit. At the time there were no controlling federal regulations. In 1971 he moved to Utah and secured a state propagation and sale permit. In 1972 federal protection of migratory birds was extended to include falconidae. Utah cancelled defendant's permit. Agents of the Bureau of Fish and Wildlife orally and in writing warned defendant that the sale of sparrow hawks was illegal. He chose to test the statutes and regulations and made three undenied sales of sparrow hawks during the period 1974–1975.

In 1916 the United States and Great Britain entered into a convention "for the protection of migratory birds." 39 Stat. 1702. The Migratory Bird Treaty Act was passed in 1918 to give effect to the convention. 40 Stat. 755, now codified as 16 U.S.C. § 703 et seq. The constitutionality of the Act was upheld in *Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641. Falconidae was not a protected species under the 1916 convention. In 1936 the United States and Mexico entered into a convention for the protection of migratory birds. 50 Stat. 1311. The Act was then amended to extend its provisions to the United States-Mexico convention. 49 Stat. 1555, 1556. By an exchange of notes in 1972, the 1936 convention was amended by adding a list of birds not included in the original convention with Mexico. U.S. Treaties and Other International Agreements, Vol. 23, Part 1, p. 260, TIAS 7302. The list includes falconidae.

The Act authorizes the Secretary of the Interior to adopt regulations to effect the purposes of the conventions. 16 U.S.C. §§ 703 and 704. Over the years many regulations have been proposed, promulgated, modified, and discarded. Before 1961 there was apparently no effort to include captive birds within the definition of migratory birds. In that year notice was given of proposed regulations which, among other things, would change the definition of migratory birds to include birds "whether

raised in captivity or not." 26 Fed.Reg. 8207. After comments were received the Secretary deleted the change in definition from the proposal. 26 Fed.Reg. 11246, 11247. In 1966 the Secretary again proposed revisions of the regulations. Included was a proposal to change the definition of migratory birds to cover birds "whether raised in captivity or not." 31 Fed.Reg. 7700. Comments were received and considered. Section 16.1 of Part 16 was revised to read, 31 Fed.Reg. 11231:

"(a) 'Migratory birds' refers to all those species of birds defined as migratory birds under § 10.1 of Part 10 of this subchapter, and includes all birds of the species which, whether raised in captivity or not, cannot be readily and visibly distinguished by general size or coloration from birds of the same species occurring in the wild state."

The pertinent, presently effective, regulations, 50 C.F.R. § 10.12, define wildlife to include any wild bird "whether or not raised in captivity." The same section defines "migratory birds" to mean "all birds whether or not raised in captivity, included in the terms and conventions between the United States and any foreign country for the protection of migratory birds and the Migratory Bird Treaty Act * * *." Section 10.13 lists as a migratory nongame bird "Raptor: Kestrel: American Falco sparverius," the kind of bird sold by defendant. Specific regulations pertain to permits for the use of falconidae and other birds in falconry, "the sport of taking quarry by means of a trained raptor." 50 C.F.R. § 21.28. In 1976 the Secretary gave notice of proposed revised regulations pertaining to falconery. 41 Fed.Reg. 2237. The notice includes this statement:

Currently raptor propagation can be authorized under a special use permit issued in accordance with 50 C.F.R. 21.27. However, in the near future new regulations will be proposed to cover captive-reared raptors and the question of the sale of such captive-reared raptors." Id.

Our attention is called to no new regulations which have been promulgated under the notice. Defendant had no special purpose permit under § 21.27.

■ Defendant argues that the definition of migratory birds to include those raised in captivity contravenes the intent of Congress expressed in the Act. Section 703, Title 16 U.S.C., provides that unless and except as permitted by regulations, it is unlawful to sell any migratory bird included in the conventions with Great Britain and Mexico. At the time of the offenses charged there was no permission to sell but rather an express prohibition.

Section 704 authorizes the Secretary "having due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds, to determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow * * * sale, purchase, * * * of any such bird * * * and to adopt suitable regulations permitting and governing the same * * *."

■ Defendant argues that the language pertaining to zones of temperature, breeding habits and lines of migratory flight have significance only to wild migratory birds and, hence, captive birds are excluded. The Act applies to migratory birds, not wild birds. The reference to wild birds in § 701 is not pertinent. It is concerned with the duties and powers of the Secretary and is not a part of the Act with which we are concerned.

Section 707(c) contains specific provisions relating to hunting. Defendant urges that only wild migratory birds may be hunted and hence the mentioned provisions show an intent that the Act not apply to captive birds. We are not persuaded. The Act must be read as a whole. The specific language of § 707 is consistent with the general language of §§ 703 and 704.

■ Section 8 of the original Act, 40 Stat. 756, authorized the taking and use of migratory birds for scientific or propagation purposes. Defendant argues that the proscription against sale of sparrow hawks

and captive-raised birds discourages propagation and, hence, thwarts the intent of Congress. We do not agree. The permission granted by § 8 applies until the adoption and approval of regulations pursuant to § 3, which is now 16 U.S.C. § 704. That section authorizes regulations to determine to what extent, if at all, sale may be permitted.

Section 711 is without pertinence. It applies to the breeding and sale of migratory game birds for the purpose of increasing the food supply. Sparrow hawks are migratory nongame birds.

■ Defendant relies on the legislative history of the Act to support his contention that Congress did not intend that the Act would apply to captive birds. Reference is made to the remarks of various congressmen in the debates on the Act. We find nothing in the legislative history which is helpful. The committee reports did not address the subject of captive nongame birds. See S.Rep. No. 27, 65th Cong. 1st Sess., and H.R. Rep. No. 243, 65th Cong. 2nd Sess. The congressional debates related largely to the constitutionality of the bill. See 56 Cong.Rec. 7360–7381 and 7472–7476. Statements in debate by others than those responsible for the preparation of the bill are entitled to little weight. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 203–204, n. 24, 96 S.Ct. 1375, 47 L.Ed.2d 668.

■ Legislative history as an aid in determining the intent of Congress is permissible only if the statute is ambiguous. *United States v. Public Utilities Commission of California*, 345 U.S. 295, 315, 73 S.Ct. 706, 97 L.Ed. 1020. Legislative history may not be used to create an ambiguity. As said in *Piper v. Chris Craft Industries, Inc.*, 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124, "[r]eliance on legislative history in divining the intent of Congress is as has often been observed a step to be taken cautiously." The difficulty is that legislative history often cuts both ways and a researcher can find a bit here and there which supports a desired view.

■ The purpose of the conventions, and of the Act, is the protection of migratory birds. The statute covers migratory birds and makes no exception of captive migratory birds. The failure to provide the exception does not make the statute ambiguous and justify resort to legislative history. The fact that captive birds do not migrate is immaterial. The question is whether the sparrow hawks which defendant sold belong to a species or group that migrate, not whether the particular birds migrate. *United States v. Lumpkin*, N.D.Ga., 276 F. 580, 583.

■ Defendant relies on the fact that from the 1918 passage of the Act until the 1966 revision of the regulations migratory birds were not defined to include all birds of a species "whether raised in captivity or not." Nonexercise of a granted power does not destroy the grant of that power. See *United States v. Morton Salt Company*, 338 U.S. 632, 647–648, 70 S.Ct. 357, 94 L.Ed. 401. The validity of regulations promulgated under an authorizing statute will be sustained so long as they are "reasonably related to the purposes of the enabling legislation." *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 280–281, 89 S.Ct. 518, 525, 21 L.Ed.2d 474; see also *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318. Reasonableness is apparent here because of the difficulty in distinguishing birds raised in captivity from others of the species. In discussing the proposed 1961 revision of the definition to include birds raised in captivity, the Secretary said, 26 Fed.Reg. 11247:

"This definition would make all migratory birds, whether raised in captivity or not, subject to regulations under permit when such birds cannot be readily distinguishable by general coloration from wild birds of the same species."

From a practical standpoint, the enforcement of the Act would be difficult if the defense was available that a bird involved was raised in captivity. In the exercise of his statutory authority, the Secretary reasonably determined that the problems relat-

ing to captive birds required their inclusion within the definition of migratory birds.

 Defendant further contends that the regulatory prohibition of sale was not within the intent of Congress. Section 703 allows sale if permitted by regulation. Section 704 authorizes the Secretary to make regulations governing "to what extent, if at all" a migratory bird may be sold. The language permits regulatory prohibition of sale. The provisions of Section 8 of the original act, 40 Stat. 756, relating to birds held and used for scientific and propagation purposes is inapplicable. The granted permission applied until the adoption and approval of regulations pursuant to § 3, now 16 U.S.C. § 704.

The contention that prohibition of sale thwarts congressional intent because it discourages propagation has no merit. The regulations provide for possession and propagation of migratory birds by public, educational and scientific organizations. See 50 C.F.R. §§ 21.12(b) and 21.27. Falconry permits are also authorized by § 21.28. The Secretary reasonably determined that problems relating to sale outweighed the necessity to permit sales other than those allowed the mentioned organizations. The regulation of sales was within the Secretary's delegated authority.

 Defendant's pre-protection sparrow hawks were acquired and held under permits from Wisconsin and Utah. His permissive possession of the birds did not carry with it the traditional incidences of property rights. The Fourteenth Amendment's procedural protection of property safeguards property "already acquired." *Board of Regents v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548. The Wisconsin permit authorizes the collection "for scientific purposes of designated birds for the purpose of "study of their reproductive behavior" and requires that the birds be kept at a designated place. The Utah permit authorizes the sale of "young produced from captive birds" under specified conditions. At the most the states granted a partial property interest which did not encompass all usual property rights. See *Got-*

*kin v. Miller*, 2 Cir., 514 F.2d 125, 129 n. 6. We reject defendant's claims of unconstitutional deprivation of property.

Defendant relies on *United States v. Marks*, S.D.Tex., 4 F.2d 420; *In re Informations under Migratory Bird Treaty Act*, D.Mont., 281 F. 546, and *United States v. Fuld*, D.Mont., 262 F. 836. These early cases under the Act were all concerned with the sufficiency of the charges and held that the Act applied prospectively and that the charges were insufficient because they did not allege acquisition after the Act became effective. The validity of these decisions was rejected in *United States v. Hamel*, 9 Cir., 534 F.2d 1354, 1356. See also *United States v. Blanket*, W.D.Okl., 391 F.Supp. 15, 19, n. 1.

*Allard v. Andrus*, decided on June 7, 1978, by a three-judge panel in the District of Colorado and not yet published, was concerned with artifacts which existed before the enactment of the federal laws protecting the species of birds whose feathers were used in creating the artifacts. The court said that "Congress chose not to include pre-act birds or products within the proscriptive terms." We are concerned with live birds, not artifacts. Defendant does not claim that any of the birds sold were possessed by him before the effective date of the protection given to sparrow hawks. The record suggests that the birds sold were offspring of birds acquired at some unstated time.

Defendant says that the misconduct of the trial judge was such that he did not have a fair trial and the effective assistance of counsel. The trial was to the court and the facts relating to the three sales were stipulated. The only issues were the validity and applicability of the statutes and regulations.

We do not approve of the conduct of the trial judge but that disapproval does not require reversal. The actions of which defendant complains were minor incidents which did not effect his substantial rights. See *United States v. Cardall*, 10 Cir., 550 F.2d 604, 605, cert. denied 434 U.S. 841, 98 S.Ct. 137, 54 L.Ed.2d 105, and *United States*

*v. Redmond*, 10 Cir., 546 F.2d 1386–1391, cert. denied 435 U.S. 995, 98 S.Ct. 1645, 56 L.Ed.2d 83, both cases involving the same trial judge. The occurrences were of little importance in their setting. See *Glasser v. United States*, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680.

Defendant, a college professor of good reputation and high community standing, was sentenced to concurrent 18-month terms of imprisonment for a first offense. The severity of the sentence appalls us. The sentence is within statutory limits and was attended by no extraordinary circumstances except its severity. We are without power to modify such a sentence. See *Dorszynski v. United States*, 418 U.S. 424, 441, 94 S.Ct. 3042, 41 L.Ed.2d 855. The judge who imposed the sentence is now dead. A timely motion for reduction of sentence under Rule 35, F.R.Crim.P., will necessarily be heard and determined by another judge.

Affirmed.

LOGAN, Circuit Judge, dissenting:

I cannot agree that the regulations adopted by the Secretary of the Interior and applied in this case are within his authority to effect the purposes of the treaties. I have reviewed the treaties, the Migratory Bird Act through its various amendments, and the legislative history. The support for including birds raised in captivity within the scope of the criminal provisions of this law must be found in reading the word "migratory" as intended to mean every bird, in the wild or any other circumstance or situation, so long as it is a member of the species or subspecies listed in one of the conventions. I concede there is logic to the approach of the majority opinion: The treaties and Act speak of "migratory" birds, and use the term "wild" only in reference to ducks and pigeons. The list of protected birds is stated in families: Anatidae or waterfowl, gruidae or cranes, bobolinks, auks, etc. The words of the Act are seemingly all-inclusive, "except as permitted by regulations . . . it shall be unlawful . . . to pursue, hunt, take, capture, kill, . . . possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase . . . any migratory bird, [or] any part, nest, or egg of any such bird, . . . included in the terms of the conventions . . ." There is also a certain logic that since it is impossible in most cases to determine whether the bird in the hunter's bag is one raised in captivity or taken from the wild, the difficulties of administration of the law require an extension of power to birds raised in captivity.

But I believe that Congress did not intend such an expansive exercise of power by the Secretary of Agriculture (now Interior). Webster's Third New International Dictionary (1976) defines migratory as "making a migration: moving habitually or occasionally from one region or climate to another." If the word has a plain meaning it would seem to be that "migratory" birds are those which in fact migrate. In my view, however, the term and its use in this legislation is ambiguous and a look to the legislative history is proper. From the debates in Congress I believe that body, at least in 1918, considered that the Act was intended to deal only with birds which in fact migrate. Representative Temple (a member of the House Foreign Affairs Committee, sponsoring the bill) in debate made the following observation:

> The birds dealt with are of three classes—migratory game birds, migratory insectivorous birds, and migratory non-game birds. These nest in one place and live a part of the year in another place. They cross the international boundary line, and if they are to be protected at all it requires international action to do it.

56 Cong.Rec. 7369 (1918).

Representative Hamilton of Michigan, (draftsman of the Section 12 amendment discussed below) stated, "May I suggest to the gentleman it does not mean migratory birds in the broad sense, but migratory birds covered by the language of the treaty. I think the distinction ought to be made all the way through." *Id.* at 7359. Representative Anthony referred to the laws for the

protection of "migratory wild fowl." *Id.* at 7360. Representative Raker read into the record an unidentified statement referring to the treaty for the protection of "migratory wild fowl" being negotiated between the United States and Canada. *Id.* at 7370. There are more than 50 uses of the word "wild" in the House debates upon the bill.

The majority opinion considers that the failure of the Act to deal expressly with captive birds is supportive of its view; but there is equal logic to the opposite conclusion. If the Act was to apply only to wild birds why would it treat captive birds in any manner? The Act did treat one class of captive bird, "game" birds. That section was added during the House debates. As finally approved it read:

> SEC. 12. Nothing in this Act shall be construed to prevent the breeding of migratory game birds on farms and preserves and the sale of birds so bred under proper regulation for the purpose of increasing the food supply.

40 Stat. 755, 757 (1918). The section survives to this day in nearly the same form. 16 U.S.C. § 711.

While that provision is limited to game birds the legislative history supports the view that it was reflective of the general attitude, not simply a narrowly carved out exception to a broad grant of power. There was much emphasis in the debates upon increasing the supply of wild life for hunting, food and protection of farm crops. When Representative Hamilton offered the new Section 12 his version read, "That one of the objects of this Act is to foster the breeding of migratory game birds on farms and preserves for the purpose of increasing the food supply." 56 Cong.Rec. 7459 (1918). On this amendment the entire discussion was as follows:

> Mr. HAMILTON of Michigan. Mr. Chairman, I offer this amendment to establish beyond all question that one of the purposes of this bill is to encourage the breeding of game birds on preserves and farms. I have been assured by the chairman of the committee that that is the purpose of the bill, and therefore I desire to have the amendment incorporated.
>
> Mr. FLOOD. Mr. Chairman, I think the amendment is a good one, and I would like to see it adopted.
>
> The CHAIRMAN. The question is on agreeing to the amendment.
>
> The question was taken, and the amendment was agreed to.

*Id.*

This addition then went to the Senate where it was noted by Senator Lodge, and discussed as follows:

> Mr. LODGE . . .
>
> That is not statutory language or the ordinary way of legislating. A statute is supposed to explain itself; and to put in "one of the objects of this act is to foster the breeding of migratory game birds on farms and preserves for the purpose of increasing the food supply"—no doubt that is an object of the act; no doubt it will have that effect if properly administered; but surely that is not the way to frame a statute. It seems to me that it ought to go back to conference.
>
> I have no objection to the amendments, but I think they ought to be properly worded and put in suitable legislative language.
>
> Mr. SMITH of Arizona. Mr. President, I have had some experience with this bill. It was debated from four to six months, it strikes me, in one House or the other—principally in this. I do not see any necessity for the statement in the bill to which the Senator from Massachusetts has made objection. I do not see any harm in it, unless some might feel that a sort of an assault would be made on Congress for the lack of a proper use of phraseology. I did not care whether or not it said "that the object of this act is to foster the breeding of migratory game birds on farms," and so forth. The act itself would settle that question, whatever Congress may declare about it.
>
> At the suggestion of those who think that these minor matters ought to be corrected I move that the Senate disagree to the House amendments and request a

conference, and that the Chair appoint the conferees.

*Id.* at 7476.

Senators Lodge and Smith, and Representative Flood were conferees on the bill. The conference report retained the section with the slight revision in language noted in the final version quoted above. That report stated:

> The Senate receded from its disagreement to amendment No. 4 with an amendment. The amendment No. 4 was a new section and stated that one of the objects of the bill was to foster the breeding of migratory game birds for food purposes. The amendment agreed upon is a new section providing that nothing in this act shall be construed to prevent the breeding of migratory game birds for food purposes.

56 Cong.Rec. 8016 (1918). *See Id.* 8430 (1918).

Also supporting this interpretation is the 1936 convention with Mexico which ultimately protected the family of birds involved in the instant case.

The introductory language in that treaty is as follows:

> Whereas, *some of the birds denominated migratory*, in their movements *cross the United States of America and the United Mexican States*, in which countries they live temporarily;
>
> Whereas *it is right and proper to protect the said migratory birds*, whatever may be their origin, in the United States of America and the United Mexican States, in order that the species may not be exterminated;

And again in Article I:

> In order that the species may not be exterminated, the high contracting parties declare that *it is right and proper to protect birds denominated as migratory*, whatever may be their origin, *which in their movements live temporarily in the United States of America and the United Mexican States*, by means of adequate methods which will permit, in so far as the respective high contracting parties may see fit, the utilization of said birds rationally for purposes of sport, food, commerce and industry.

And Article II:

> The high contracting parties agree to establish laws, regulations and provisions to satisfy the need set forth in the preceding Article, including:
>
> A) The establishment of close seasons, . . . *except when proceeding*, with appropriate authorization, *from private game farms or when used* for scientific purposes, *for propagation* or for museums.
>
> . . . . .
>
> E) The prohibition of the killing of migratory insectivorous birds, *except when* they become injurious to agriculture and constitute plagues, as well as when *they come from reserves or game farms* : provided however that such birds may be captured alive and used in conformity with the laws of each contracting country.

50 Stat. 1311. [Emphasis supplied.]

I think it is also quite significant that no attempt was made to extend the regulations to birds raised in captivity until the 1960's, and it was not done until 1966, some 48 years after the Migratory Bird Act was passed. Surely this delay is persuasive that the general understanding was that wild birds only were the object of the convention. It is to be noted that 16 U.S.C. § 701, containing what is left of a 1900 act, refers to "game birds and other wild birds" another indication of the thinking in that era, that there was likely no significance in the fact "wild" was not used as an adjective with "migratory birds." The arguments and opinion in *Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1925), indicate that the parties and the Supreme Court thought the Act covered wild birds only. *See also, Koop v. United States*, 296 F.2d 53, 59 (8th Cir. 1961).[1]

---

1. "It is common knowledge that ducks, and particularly mallard ducks, lend themselves to being tamed or domesticated and that ducks generally found in most farmyards trace their

It is possible to argue, of course, that since the Migratory Bird Law was amended in 1974, Congress implicitly approved of the interpretation by the Secretary of Interior in the 1966 regulation. *Cf. Provost v. United States,* 269 U.S. 443, 46 S.Ct. 152, 70 L.Ed. 352 (1926). But there is no indication in the legislative history of the 1974 amendments that the legislators knew of that regulation change. The fact the instant case is the first to arise under the 1966 regulation is a strong indication this is not well known. The game farm provisions were left unchanged. The exclusion from the prohibitions quoted above from the treaty with Mexico, and similar provisions in the convention with Japan in 1972, favoring birds raised on game farms and used for propagative purposes, tend to support my construction of the Act.

Several other considerations also compel me to conclude we ought not allow this crime by regulation. In 1960 amendments to the Migratory Bird Act the penalties were substantially increased. Sale of a covered bird became a felony, punishable by a fine of up to $2,000 and imprisonment for not more than two years. At numerous times during the House debates in 1918 the delegation of authority to promulgate regulations were referenced or attacked. At almost each juncture the delegation was justified on grounds the crime would only be a misdemeanor. Thus, for example, Representative Flood, floor manager for the bill, engaged in an exchange with Representative Graham as follows:

Mr. GRAHAM . . .

Many days, months, or perhaps a year may have passed before these regulations which have been promulgated will appear in these published Statutes at Large. There is no way for the public to find out about these things, and that is the principal trouble with this sort of legislation. I say to you here now, that I stand here ready to insist upon or to favor in every way that I can, regulations for the pro-

tection of our wild life and the conservation of our bird life, but they ought to be statutory law, law that will apply to the whole country, and laws that you and I helped make, and about which we can tell our constituents. [Applause.]

Mr. FLOOD. Mr. Chairman, I do not think the suggestions made by the gentleman from Illinois [Mr. GRAHAM] that this is a very severe penalty is tenable. The maximum fine can not be but $500 and the maximum imprisonment can not be for more than six months. The court could fine $1 and imprison for one day. It is idle, therefore, to complain of the severity of the penalty.

56 Cong.Rec. 7452 (1918). *See also, Id.* 7440, 7441, 7444, 7453.

Also relevant to me is that historically the law has treated wild animals, *ferae naturae,* which were free in nature differently from the same animals in captivity or raised in captivity. When free in nature they are considered to belong to no one until reduced to possession. But once reduced to possession the possessor has a property right until escape, and even thereafter if the animal has the habit of periodic return, *animus revertendi.* Arnold, *The Law of Possession Governing The Acquisition of Animals Ferae Naturae,* 55 Am.L. Rev. 393 (1921), in Fryer, Readings on Personal Property 55 (3d ed. 1938). In more recent times some courts have modified the law to hold ownership is retained in nondomestic animals raised in captivity after escape even where there is no *animus revertendi. See E. A. Stephens & Co. v. Albers,* 81 Colo. 488, 256 P. 15 (1927); Brown On Personal Property § 10 (2d ed. 1955). These distinctions recognized since early times certainly lend credence to the view that Congress may have intended a difference between wild birds and those raised in captivity.

Most importantly, I cannot see how application of the penalties of the Migratory Bird Act to the situation at issue here promotes any aim of that law. The stated

ancestry back to the wild and untamed ducks with whose protection and care the Migratory Bird Treaties and regulations were concerned. Concededly, however, the law was not meant

for, nor may it regulate or control the use of, such tamed or domesticated ducks." 296 F.2d 59.

purposes of the treaties and the Act are to preserve and increase the supply of these wild life. 16 U.S.C. § 711 says it directly as to game birds bred on farms and preserves.

Today the whooping crane would be nearer extinction had not some of the birds been hatched in captivity. Where would our supply of buffalo be if landowners had not undertaken to raise some in private managed herds, selling to others who did the same?

Prohibitions in the statute that it is unlawful "to pursue, hunt, take, capture, kill . . . possess" have no real application to birds already lawfully in possession and their raised-in-captivity offspring. The injunction against "offer for sale, sell, offer to barter, barter, offer to purchase, purchase" have fully understandable and laudatory meanings where applied to wild birds. Without them there would be increases in the slaughter and capture of wild birds. But in the context of birds lawfully possessed and being raised in captivity these prohibitions can only decrease the numbers and discourage this praiseworthy activity.

I do not say the Secretary may not adopt regulations which will affect those who raise captive birds, if necessary to protect the wild birds. But like the court in *Allard v. Andrus*, No. 75–W–1000 (D.Colo., filed June 7, 1978), I believe there must be a way other than absolute prohibition of sale.

It might be argued that the sparrow hawks here involved, as falcons, are birds of prey and hence their increase has the effect of decreasing the supply of other birds. The answer is that the treaty with Mexico placed them on the list, where the object is to protect them and to increase their numbers.

Here we have the manager of the research animal laboratory at Brigham Young University, an expert on these birds, sentenced to prison for 1½ years on each of three counts (fortunately with concurrent sentences) for selling sparrow hawks he raised himself. At the time he lawfully acquired the ancestors to the birds sold, the birds were not covered by any national act or treaty. No adverse effect upon the migratory bird population of the world is observable from his activities. The regulations themselves exempt state and municipal game departments, public museums, zoological parks and scientific or educational institutions from the prohibition against sales of these birds. 50 C.F.R. § 21.12 (1976). It would seem that through bills of sale, banding, registration or other means, defendant's birds could always be identified as to their source and origin.

The normally applied rule for criminal statutes is for strict construction in favor of an accused. This law was passed in 1918. Its only reference to captive birds is to insure that game bird breeding is to be encouraged and *no prohibition upon sale* allowed. Forty-eight years after the law's enactment, and after penalties were increased to make sale of protected birds a felony, the act was extended, by regulation, to birds raised in captivity. The prohibition applies discriminatorily against this private individual, as there is given an exemption to public zoos and other institutions.

I would hold the regulation invalid, as beyond the power intended to be delegated by Congress, and inconsistent with the objectives of the conventions and the Migratory Bird Act.