UNITED STATES of America, Plaintiff-Appellee,

v.

Ronald Hubert CONNERS, Defendant-Appellant.

No. 78–1210.

United States Court of Appeals, Tenth Circuit.

Submitted Jan. 26, 1979.

Decided April 4, 1979.

Rehearing Denied Nov. 6, 1979.

J. Terry Wiggins, Denver, Colo., for defendant-appellant.

William C. Danks, Asst. U. S. Atty., Denver, Colo. (Joseph F. Dolan, U. S. Atty., Denver, Colo., on brief), for plaintiff-appellee.

Before HOLLOWAY, BARRETT and LOGAN, Circuit Judges.

BARRETT, Circuit Judge.

Robert Hubert Conners (Conners) appeals from a judgment of conviction that he unlawfully hunted, killed and attempted to kill migratory birds in violation of 16 U.S.C. § 703.[1]

On May 20, 1977, the Colorado Retriever Club was conducting field trials at the Rocky Mountain Arsenal near Denver, Colorado.[2] During the trials, a group of ducks entered the area of one of the field trial throwing stations disrupting the competition. The field trials were terminated for about an hour and a half while the participants attempted to haze the birds out of the area. Finally, in order to expedite the trials, the ducks were shot and killed.

Conners was subsequently charged in a one-count Information with violating Title 16 U.S.C. § 703. The United States magistrate assigned to the case found Conners guilty as charged and issued specific findings of fact. Conners' conviction was affirmed on appeal to the United States District Court for the District of Colorado.

1. Title 16 U.S.C. § 703 provides as follows:
   Taking, killing, or possessing migratory birds unlawful
   Unless and except as permitted by regulations made as hereinafter provided in sections 703 to 711 of this title, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport, or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916 (39 Stat. 1702), the United States and the United Mexican States for the protection of migratory birds and game mammals concluded February 7, 1936, and the United States and the Government of Japan for the protection of migratory birds and birds in danger of extinction, and their environment concluded March 4, 1972.

2. The field trials consisted of throwing mallard ducks or other birds into a pond located at the arsenal whereupon trained dogs were released to retrieve the birds. The birds used were "captive-reared" which were purchased from legitimate suppliers and were either killed or bound for use in the trials. The use of such "captive-reared" birds in bond fide dog training or field trials is specifically permitted by 50 C.F.R. § 21.13(d) (1977) and 16 U.S.C. § 703.

The issues presented for our review are: (1) whether 16 U.S.C. § 703 prohibits only the killing of mallard ducks which are "wild" and, if so, (2) whether the government sustained its burden of establishing that the ducks allegedly killed were "wild."

## I.

In 1916, the United States of America and the United Kingdom of Great Britain and Ireland entered into a convention "for the protection of migratory birds in the United States and Canada . . . ." *Convention between United States and Great Britain for the Protection of Migratory Birds,* 39 Stat. 1702 (1916). The Migratory Bird Treaty Act was enacted to give effect to that treaty in July of 1918. 16 U.S.C. § 703, *et seq.* The constitutionality of both the Treaty and the Act was subsequently tested and upheld in *Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920).

In 1936, the United States of America and the United Mexican States entered into a similar agreement for the protection of migratory birds and game mammals. *Convention for the Protection of Migratory Birds and Game Mammals,* 50 Stat. 1311 (1936).[3] The Act was amended to include the terms of that treaty.

Later, in March of 1972, the United States and the Government of Japan entered into a similar convention which was thereafter incorporated into the provisions of the Act. *Convention for Protection of Migratory Birds and Birds in Danger of Extinction in their Environment.* 25 U.S.T. 3329.

▪ Conners asserts that the above-mentioned treaties, and their companion statute, apply only to mallard ducks which are "wild" and not to those which have been "captive-reared." We agree.

Title 16 U.S.C. § 703 protects only those migratory birds "included in the terms of the conventions between the United States

and Great Britain . . . , the United States and the United Mexican States . . . and the United States and the Government of Japan . . . ." Thus, we must look to the treaties themselves to determine whether or not "captive-reared" mallards are a protected class.

Article 1 of the United States-Great Britain treaty provides in part:

### Article I.

The High Contracting Powers declare that migratory birds included in the terms of this Convention shall be as follows:

1. Migratory Game Birds: (a) Anatidae or water fowl, including, brant, *wild ducks,* geese, and swans. 39 Stat. 1702 (1916). (Emphasis supplied.)

Similarly, the convention between the United States of America and the United Mexican States provides in pertinent part:

### Article II.

The high contracting parties agree to establish laws, regulations and provisions to satisfy the need set forth in the preceding Article [protection of migratory birds], including:

\* \* \* \* \* \*

D)—The establishment of a closed season for *wild ducks* from the tenth of March to the first of September. 50 Stat. 1312–1313 (1936). (Emphasis supplied.)

The convention between the United States of America and the Government of Japan, however, does not delineate between "wild" ducks and "captive-reared" ducks:

### Article II.

1. In this Convention, the term "migratory birds" means:

(a) The species of birds for which there is positive evidence of migration between the two countries from the recovery of bands or other markers; and

---

**3.** The United States-Mexican convention was amended in 1972 by adding a list of protected species not included in the original agreement.

*See:* Exchange of notes at Mexico and Tlatelolco 23 U.S.T. 260, T.I.A.S. 7302.

(b) the species of birds with subspecies common to both countries or, in the absence of subspecies, the species of birds common to both countries . . . .

2. (a) The list of species defined as migratory birds in accordance with paragraph 1 of this Article is contained in the Annex of this Convention.

\* \* \* \* \* \*

### ANNEX

No. 44, Mallard (Anas platyrhynchos). 25 U.S.T. 3332.

The failure of the United States-Japan treaty to specifically delineate between "captive-reared" and "wild" mallard ducks creates an ambiguity which must be resolved by interpretation of the three treaties.

■■ In undertaking such an interpretation, we must attempt to ascertain the intent of the parties to the agreements in order to construe the documents in a manner consistent with that intent. *Maximov v. United States,* 299 F.2d 565 (2d Cir. 1962), *aff'd,* 373 U.S. 49, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963). In construing the meaning of specific words in the treaties, great deference should be given to the interpretation of the agency charged with the duty of carrying out their mandates. *National Indian Youth Council v. Bruce,* 485 F.2d 97 (10th Cir. 1973), *cert. denied,* 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

The agency charged with the enforcement of the subject treaties, pursuant to the provisions of the Migratory Bird Treaty Act, *supra,* is the United States Fish and Wildlife Service. The regulation of that agency defines the term "migratory game birds" to include "[a]natidae (*wild ducks,* geese, brant, and swans) . . . ." 50 C.F.R. § 20.11 (1977).

■ Inasmuch as two of the treaties and the controlling regulation specifically refer to "wild ducks," and that criminal statutes must be strictly construed, with ambiguities resolved in favor of the accused, *United States v. Enmons,* 410 U.S. 396, 411, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), we hold that the provisions of the Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.,* do not apply to the killing or attempted killing of "captive-reared" ducks.[4]

In so holding, we do not question the authority of the United States Fish and Wildlife Service to promulgate reasonable regulations designed to distinguish "captive-reared" mallard ducks from "wild" mallard ducks so as to effectuate the intent of the treaties. *See:* e. g., 50 C.F.R. 21.13 (1977).

### II.

Conners also contends that the court erred in denying his motion for judgment of acquittal on the grounds that the Government failed to prove that the mallard ducks killed were "wild."

■ We have carefully reviewed the findings and conclusions of the United States magistrate in this case. There is no finding on the question of whether or not

---

4. We emphasize that in so holding we do not call into question *United States v. Richards,* 583 F.2d 491 (10th Cir. 1978). In *Richards,* the defendant was charged with, and found guilty of, the sale of three sparrow hawks in violation of the Migratory Bird Treaty Act, 16 U.S.C. § 703, *et seq.* On appeal, Richards' primary contention was that the subject birds were raised in captivity and therefore not protected under the Act. The majority held that the statute covered migratory birds and made no exception for captive migratory birds. The conviction was, therefore, affirmed.

*Richards* is clearly distinguishable from the instant case. The birds involved in *Richards* were *falconidae,* migratory non-game birds sometimes known as kestrel or raptors. None of the three treaties referred to in this case, and applicable in *Richards,* distinguish between "wild" and "captive-reared" kestrel or raptors. Moreover, the regulations of the United States Fish and Wildlife Service do not single out kestrel or raptors for "wild" versus "captive-reared" designation, but rather classify them simply as migratory birds. Under such classification, the regulations specifically provide that the provisions of the treaty and the Act apply to such birds whether raised in captivity or not.

The unique fact that the treaties and regulations specifically refer to "wild ducks" rather than simply "ducks," distinguishes this case from *Richards. Cf. Koop v. United States,* 296 F.2d 53, 59 (8th Cir. 1961.)

the ducks killed by Conners were "captive-reared" or "wild." When a trial court has failed to express its views on a controlling question, it is appropriate for the appellate court to remand the case to that court, rather than deal with the merits of the question on appeal. *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

■ On remand, the trial court is specifically directed to declare whether or not the ducks killed by Conners were "captive-reared" or "wild."[5]

Should the trial court find that the ducks killed by Conners were "wild," the conviction should be sustained. On the other hand, if the trial court finds that the mallard ducks killed by Conners were "captive-reared," the charges should be dismissed.

Remanded with instructions.

LOGAN, Circuit Judge, concurring:

I concur in the opinion and in everything said therein except the inferences that the Department of Interior could classify captive-reared birds which are not "wild," whether ducks or other birds, as subject to the Migratory Bird Act. On that subject I adhere to the views stated in my dissent in *United States v. Richards,* 583 F.2d 491 (10th Cir. 1978).

HOLLOWAY, Circuit Judge, dissenting:

I respectfully dissent. I am unable to draw the distinction for "wild" mallard ducks which the majority finds. To me, the findings and conclusions of the magistrate and the district court's opinion amply support the conviction of defendant-appellant Conners and I would therefore affirm.

The defendant's brief refers to the contention at trial as to whether the ducks which were killed were the ones which had escaped from the cages of the Colorado Retriever Club or were the experimental birds belonging to Ells, a civilian employee of the Government. The defendant's brief then acknowledges that three Government witnesses testified that the birds which were killed had streamers on one wing (identification which was supposed to have been on the arsenal birds), while the co-defendant Mathias and four other witnesses testified that they did not have the streamers and were believed to be field trial ducks. (Brief of Appellant, 5–6). This admitted evidence is sufficient to me, along with the findings made, to sustain the convictions.

The majority opinion relies on references in the treaties with Great Britain and Mexico (but not with Japan) and in the regulations to "migratory game birds" and "wild ducks." In 50 C.F.R., § 20.11, there is a definition of "migratory game birds"[1] for which open seasons are prescribed, and that

---

**5.** We observe that 50 C.F.R. § 21.13 (1977) provides that "captive-reared" mallard ducks shall be marked prior to reaching six weeks of age by:

> "(1) Removal of hind toe from the right foot.
> (2) Pinioning of a wing: *Provided,* That this method shall be the removal of metacarpal bones of one wing or a portion of metacarpal bones which renders the bird permanently incapable of flight.
> (3) Banding of one metatarsus with a seamless metal band.
> (4) Tatooing of a readily discernible number or letter or a combination thereof on the web of one foot."

We do not decide whether the establishment of a lack of such markings, either by direct or circumstantial evidence, creates a rebuttable presumption that the birds killed were "wild." *See: Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d

508 (1975); *Barnes v. U. S.,* 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); *Turner v. U. S.,* 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970); *Leary v. U. S.,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); *Tot v. United States,* 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943).

**1.** 50 C.F.R. § 20.11 provides in part:

> § 20.11 Meaning of terms.
> *For the purpose of this part,* the following terms shall be construed respectively, to mean and to include:
> *"Migratory game birds"* means those migratory birds included in the terms of conventions between the United States and any foreign country for the protection of migratory birds, for which open seasons are prescribed in this part and belong to the following families:
> (1) Anatidae (wild ducks, geese, brant, and swans); (Emphasis added)

definition does enumerate "(1) Anatidae (wild ducks, geese, brant, and swans)." However this definition is plainly limited to the part of the regulations on "Migratory Bird Hunting." Our case, of course, does not involve such open season hunting. The regulation applicable here, I feel, is the one in 50 C.F.R. § 10.12 with the general definition of "migratory birds." This definition is applicable throughout Subchapter B (see 50 C.F.R. § 10.11) on the "Taking, Possession . . . of Wildlife and Plants." That general definition clearly protects migratory birds "whether or not raised in captivity . . ."[2] We have recently rejected arguments seeking to narrow the protection afforded to migratory birds by the treaties and the regulations. See *United States v. Richards*, 583 F.2d 491 (10th Cir.). We stated there that "[t]he Act applies to migratory birds, not wild birds." *Id.* at 494.

It is true that if we had only the treaty with Great Britain to consider, the defendant's position would seem correct because the only definition of that treaty embracing ducks appears in its definition of migratory game birds which includes, *inter alia*, "(a) Anatidae or waterfowl, including brant, wild ducks, geese and swans." 39 Stat. 1702. However, the treaty with Mexico includes within its general definitions in Article IV of migratory game birds the "Familia Anatidae." 50 Stat. 1313. The additional provision in Article II of the Mexican treaty for establishing a close season for wild ducks, *id.*, does not detract from the breadth of the general protective definition. And the treaty with Japan, as the majority opinion notes, has a broad and clear definition of "Mallard (*Anas platyrhynchos*)" as a protected species of migratory birds. 16 U.S.C. § 703 prohibits the killing, *inter alia*, of "any migratory birds . . . included in the terms of the conventions" with the three nations. Since the statute protects *any* migratory bird within any of the three treaties, the clear provisions of the treaty with Japan are enough to protect the ducks involved in this incident. See Coggins and Patti, The Resurrection and Expansion of the Migratory Bird Treaty Act, 50 U.Colo.L.Rev. 165, 177. (1979).

The district court's opinion explains persuasively why there is no applicable exception in the regulations covering the killing of the ducks in this case. Since no such exception in the regulations applies, I feel that 16 U.S.C. § 703 prohibited the killing of the ducks and that the conviction should be upheld.

2. 50 C.F.R. § 10.12 provides in pertinent part:
   "Migratory birds" means all birds, whether or not raised in captivity, included in the terms of conventions between the United States and any foreign country for the protection of migratory birds and the Migratory Bird Treaty Act, 16 U.S.C. 703–711. (For reference purposes only a list of migratory birds by species appears in § 10.13).
   "Migratory game birds": See § 20.11 of this subchapter.