# ELI ULERY

*v.*

# CLAYBORN JONES *et al.*

1. ANIMALS—*feræ naturæ.* A buffalo which has been captured when a calf, and reared on a farm with domestic cattle, and become so tame as to take food from the hands of its master like other cattle, and to be easily driven home when it strays away, is no longer of a wild nature, but is the subject of property, and for any trespass committed by it the owner is liable, and for any injury done to it by others he can recover damages.

2. TRESPASS—*what amounts to a license.* The expression " go and kill him if you want to," made in May, by the owner of an animal, in a heated conversation with one who was complaining of a trespass committed by it, and in reply to a threat to kill it, is not a license to such person to kill the animal in September following.

APPEAL from the Circuit Court of Macon county; the Hon. C. B. SMITH, Judge, presiding.

Mr. A. B. BUNN, for the appellant.

Messrs. CREA & EWING, for the appellees.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was trespass, in the Macon circuit court, to recover damages for killing a buffalo bull, alleged to be the property of the plaintiff.

The defense was set out in several special pleas, the substance of which was, that as the animal was *feræ naturæ*, and trespassing on defendant's close, disturbing his cattle and annoying his family, he had a right to kill him; and, further, that defendant was licensed and permitted, by the plaintiff, to kill the animal.

On these issues the cause was tried, and a verdict found for the defendant. The plaintiff appeals.

The leading facts are, briefly, these: The animal in question was brought, when a calf six months old, with a companion heifer, from their native plains, to the farm of plaintiff, who

was engaged in raising cattle, and there reared with his other young stock, treated in all respects as they were, and became gentle and accustomed to their new home and mode of life, taking food from the hand of a child. When the bull was two years old, he was turned into the pasture with other cattle, and could be and was handled and fed without danger or trouble. He was breachy, and of a roving disposition, and annoyed the defendant very much by jumping over his fence into his pasture, and annoying him in various ways, but he had no trouble in preventing him from attacking, by the use of a common pitch fork. Several of the neighbors, who testified, seemed to be afraid of him, and ran from him whenever he assumed a warlike attitude, putting his head near the ground and hissing a strange and alarming sound. One witness, on horseback, in a lane, on one side of which was a pasture with a high fence, and the bull inside of it, says, he ran his horse to keep out of his way. Other witnesses testified similarly. Some witnesses testified, when the young animal was in the pasture with plaintiff's cattle, the school mistress, with little girls in company, were in the habit of going through this pasture, when the bull was there, to and from school, without the least concern, and defendant permitted his children to do the same.

One witness, Mrs. Anna Gibson, says she lived in the edge of the timber, and one evening she and one of the girls went out to milk, and when they had finished, she looked up and saw the bull, a rod or two off, looking right at them, and instead of running, as the Nicholsons did, one climbing over a fence and the other taking a large tree for protection, she stood her ground, the bull making no hostile demonstrations, but she, still afraid of him, just flapped her apron at him and said "shoo;" the bull turned, and ran away in great alarm, never stopping, "but ran clean away." Soon after, she heard the animal was killed. An animal so easily frightened away, surely can not be adjudged a dangerous animal, so dangerous as to justify a farmer, into whose pasture he might trespass, in "killing him on the spot."

Appellee insists, this animal, being *feræ naturæ*, was tres-

passing on his premises, and he had a right to kill him. He contends, the animal was not in such a condition of subjection to its owner as to give him a property in the animal. He cites that passage, in 2 Blackstone's Com. 389, 390, with which all are familiar, and lays great stress upon the fact that it was not proved the animal, when it had strayed away from the owner's enclosure was accustomed to return to it, and, therefore, being found wandering at large, he became game for the hunter, and if actually trespassing on a neighbor's enclosure, such neighbor would have the right to shoot him down.

The proof on this point is, that once, certainly, the animal, after an absence of some time, returned voluntarily to his owner, but usually, when neighbors made their complaints of his conduct, appellant would send a man and drive him home. The animal was scarcely old enough to have acquired the habit of coming home, nor do our domestic animals of that kind, at certain seasons of the year, make regular returns to their homes, yet they fail not, even after long absences, to return to their master's crib. An ordinary domestic bull, at the early age of two years, would, quite likely, lack the observance of the custom insisted upon as an unerring evidence of domesticity. This animal may be said to have been, at all times, in the keeping and actual possession of his owner, for he was so tame and gentle, there was no trouble in driving him home to his accustomed pasture—as much in his actual possession and keeping as a domestic breachy animal can be who is absent from his home for weeks or months. Who can say, when this young animal should have matured he would not have returned regularly with the herd to their proper home? But, whether or not, it can not be denied, under the evidence, the animal was so tame and gentle as to render it no longer of a wild nature. It was completely tamed, and, therefore, a subject of property.

For his trespasses, and the annoyances inflicted by him upon appellee and others, the courts were open to them for redress, and for all injury occasioned by him, his owner could be made to respond in damages. The owner of this animal

was at great expense in transporting him from his native wilds, rearing and taming him, and for a good purpose—to produce a cross with the domestic animal, which might prove of great public benefit. But if that was not so, still the animal was valuable for food. How often have we heard the old hunters of the plains extol the tongue and rump of the buffalo as most luscious and nourishing food! And it is in proof, the meat of the animal is sold at high prices for food in the markets of the country. That this animal was property, can there be a doubt? Had appellee stolen him, would he not be indictable for larceny?

On this branch of the case, we think no justification was shown.

Now as to the license. It is not at all probable the owner of such property as this, costing so much money and trouble to get, would coolly and deliberately give to a party the privilege of shooting him, or killing him in any other way; nor did this appellant do so.

It appears, in May or June, 1874, the animal had been troublesome to appellee, and he went to the owner to make complaint. He found appellant at his barn, and appellee told him the buffalo was at his house bothering him a good deal, and that he must keep him up or he (appellee) would shoot him. Appellant was just preparing to go away on horseback, and said to appellee if he would get a bull and put him with his cows the buffalo would not bother him. Appellee replied, when he wanted a guardian he would let him know, and again told him he must keep the buffalo away from his place or he would shoot him. Appellant replied, " then go and shoot him if you want to."

On the 22d of September, three months and more thereafter, the bull covering one of appellee's cows, or attempting to do so, was shot and killed, no effort being made to drive the bull from the cow. Surely, it can not be seriously claimed that this heated conversation, in May preceding, was a license to appellee to do this deed at the time it was done. Had he returned, after this conversation in May or June, immediately

home and killed the bull, he might, perhaps, successfully plead a license. But they were evidently words of passion and pique when spoken, and certainly not with the expectation the killing would be done. " Then go and shoot him if you want to," was the expression. Not, if you want to at any other time, but now, coming with your grievances, shoot him if you want to. We are greatly impressed with the conviction there was no license to kill the animal when he was killed. For the injury done by the animal, if he did any, for the annoyance by his untimely visits, ample redress could be obtained in the courts of the country. It was against law for appellee to take the remedy in his own hands—be his own judge of the extent of the wrong and of the proper measure of redress.

In looking over the testimony in this record, we find not a particle of physical injury done by this animal to appellee, or to any of his family, or to any other person, and, so far from the animal being wild, ferocious and dangerous, the fears of the witnesses are the father to the thought. Mrs. Gibson drove the animal out of sight, by merely flapping her apron at him.

So far as we can understand this record, no justification or license was proved. The verdict is against the law and the evidence, and the judgment thereon must be reversed and the cause remanded for a new trial.

*Judgment reversed.*