## No. 11,726.

E. A. STEPHENS & COMPANY v. ALBERS.

Decided May 2, 1927.    Rehearing denied May 31, 1927.

Action in replevin.   Judgment for plaintiff.

*Affirmed.*

### On Application for Supersedeas.

1.  ANIMALS—*Ferae Naturae*—*Property.*  Where a partially domesticated silver fox escaped from its owner and was shot by a stranger, the pelt—bearing marks of identification—was the property of the original owner as against a purchaser who procured it from one not having title.

*Error to the County Court of the City and County of Denver, Hon. George W. Dunn, Judge.*

Messrs. MELVILLE, MELVILLE & TEMPLE, for plaintiff in error.

Mr. W. R. RAMSEY, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE BURKE delivered the opinion of the court.

THESE parties appeared in reverse order in the trial court and we hereinafter refer to them as there.

Plaintiff brought this action in J. P. court for the value of a fox pelt and had judgment for $300.00.   Appealed to the county court, and there tried as replevin without a jury, it resulted in a judgment for the return of the property or the payment of its value, i. e., $75.00. Defendant brings error and asks that the writ be made a supersedeas.   The parties join in a request for final decision.

We learn from the record that a certain subspecies of fox, having its habitat from central United States "north to the treeless tundras," was a wild fur bearing animal valuable only for its pelt; that the individuals thereof varied in color from dull yellow to black, and were known accordingly as "red," "cross," "silver," "silver-black," and "black." Of these the rarest, having fur the most difficult to imitate, and hence the most valuable, was the "silver," or "silver-black." Some forty years ago silver foxes became very scarce and enterprising trappers and traders founded the business of breeding them in captivity. At one time a single skin sold in London for $2,700. The industry was first established on Prince Edward Island and spread thence throughout Canada and the United States, until in 1922 there were, in this country alone, approximately 500 silver fox ranches, holding in captivity 15,000 animals, operating as stock ranches and farms for the breeding of domestic animals, representing an investment of $8,000,000, keeping registration books, issuing pedigrees, breeding for size, form, disposition, color and luster, wrestling with problems of housing, mating, inbreeding, feeding, weaning, culling, transporting, killing, skinning, and marketing, and classifying its products as "scrubs," "grades," and "thorough-breds."

In January, 1926, plaintiff embarked in this business when she received, and installed at the ranch in southern Morgan county where she and her husband lived, several silver foxes, among them one "McKenzie Duncan" whose pelt is the subject of this litigation. He was registered under No. 11335 of the Silver Fox Breeder's Association of Prince Edward Island. His pedigree shows him to have been bred by J. A. McKenzie of that place, tattoo marked "1" in the right ear and "335" in the left, and his ownership transferred by said McKenzie to the Windswept Farms of Henderson, New York. It is in evidence, and undisputed, that plaintiff purchased McKenzie Duncan from the last men-

tioned owner for $750, and that a common method used by breeders to mark individuals for identification is tattooing in the ears. Duncan was of the second generation born in captivity and, although kept in an enclosure especially designed to guard against the admitted danger of escape and flight, was sufficiently domesticated to take food from the hand of his keeper. Within two weeks, however, he slipped through an inner gate, inadvertently left unfastened at feeding time, and, excited by his owner's cry for aid, cleared the outer fence and disappeared. Nightfall soon put an end to pursuit and the following evening he fell a victim to the shotgun of a ranchman, some six miles distant, who discovered him prowling near his chicken house. This man knew nothing of the name, nature, value, or ownership, of McKenzie Duncan, but took his pelt and entrusted it to a trapper to dispose of on commission. The trapper sold it to defendant for $75, pocketed the money and passed out of the picture. Plaintiff later learned the fate of her fox, instituted an inquiry which located its pelt in defendant's possession, and this litigation ensued. The pelt in question was introduced in evidence and, although then dried and wrinkled about the head, the tattoo marks were still distinguishable. Defendant's manager, who bought the skin from the trapper, testified that at that time it showed ten or twelve shot punctures and that a part of the nose had been shot away whereas the method of killing followed by those engaged in the industry is by crushing or poisoning. He further testified that at the time of the purchase he did not make an inspection for indicia of ownership; that he had been in the business nine years and was an expert in it; had handled over 30,000 skins; knew that he was buying this skin from a professional trapper; was advised that the seller was not the owner but represented a man who had killed the animal on a ranch in eastern Colorado; and that this was the only skin bought that season which came from a fox that had been shot; he also said the

price paid was due in part to the fact that the fur was black, which seems to have been the view of the county court, whereas plaintiff insisted it was silver-black, and apparently so convinced the J. P. court.

Defendant says McKenzie Duncan was a wild animal whose possession was essential to ownership, and that when he escaped and pursuit was abandoned plaintiff lost title which the ranchman obtained by slaughter and passed to defendant by sale. Plaintiff says the fox was domesticated; that his disposition to return to his pen (animum revertendi) must be presumed; that irrespective of such facts foxes are taxable in this state, hence the common law rule as to domesticated animals applies; and that the common law rule as to wild animals is not applicable here.

So far as we have been able to determine the diligence of counsel has spread before us all "the law and the Gospels" touching the question at issue. Four chapters of the Bible, department bulletin No. 1151 of the United States Department of Agriculture, Belden on Fur Farming for Profit, Harding on Fox Raising, Darwin's Origin of Species, Shakespeare's Henry IV, St. John Lucas, Suetonius, Aesop's Fables, the Tale of the Spartan Youth, the Harvard Law Review, the Albany Law Journal, the Central Law Journal, the London Law Times, the Criminal Law Magazine, and certain anonymous writers, not to mention numerous statutes and court decisions, adorn and illuminate their briefs. Leaving with reluctance all these landmarks save the last two mentioned, we turn to the question here at issue, which is one of first impression in this jurisdiction.

For the common law we go to Blackstone who says: A qualified property may subsist in wild animals "by a man's reclaiming and making them tame by art, industry and education; or by so confining them within his own immediate power, that they cannot escape and use their natural liberty. * * * These are no longer the property of a man, than while they continue in his keep-

ing or actual possession: but if at any time they regain their natural liberty, his property instantly ceases; unless they have *animum revertendi* (the intention of returning), which is only to be known by their usual custom of returning . * * * The deer that is chased out of my park or forest, and is instantly pursued by the keeper or forester: remains still in my possession, and I still preserve my qualified property in them. But if they stray without my knowledge, and do not return in the usual manner, it is then lawful for any stranger to take them. But if a deer, or any wild animal reclaimed, hath a collar or other mark put upon him, and goes and returns at his pleasure; * * * the owner's property in him still continues, and it is not lawful for any one else to take him: but otherwise, if the deer has been long absent without returning, * * *.

In all these creatures, reclaimed from the wildness of their nature, the property is not absolute but defeasible: a property, that may be destroyed if they resume their ancient wildness and are found at large. * * * But while they thus continue my qualified or defeasible property, they are as much under the protection of the law, as if they were absolutely and indefeasibly mine; and an action will lie against any man that detains them from me, or unlawfully destroys them. It is also as much felony by common law to steal such of them as are fit for food, as it is to steal tame animals: but not so, if they are only kept for pleasure, curiosity, or whim, * * * because their value is not intrinsic, * * *." Blackstone's Commentaries Vol. 1, Book 2, pp. 388–395, Cooley's Edition (4th) Vol. 1, p. 742; Kent's Commentaries (14th ed.) Vol. 2, p. 348.

From the foregoing also, as well as from 1st Hale's P. C. (1st Am. Ed.) 512, and 2 Bishop Crim. Law, sec. 773, it appears that one of the reasons for the rule was lack of intrinsic value, a reason which has no application to the fox farming industry as conducted at the present time.

It should be borne in mind that when this common law rule was formulated the great wild animal menageries of the present day, with their enormous collections and vast investments, were in embryo, and the business of raising fur bearing animals in captivity was practically unknown in England.

Counsel for defendant insists that whether an animal be wild or domestic must be determined from the species, not from the individual. In this position the cases do not support him, even those at common law. The exception, which was a part of the rule, applied to animals having an intention to return, (animum revertendi) was based upon characteristics of the individual. That exception was invoked in *Manning v. Mitcherson,* 69 Ga. 447, 47 Am. Rep. 764, a suit over a canary bird, and *Ulery v. Jones,* 81 Ill. 403, an action involving a buffalo bull calf. But the exception was in each stretched until it cracked because in each a single return was shown from which the "usual custom of returning" was inferred. We think these cases cannot be reconciled with *Mullett v. Bradley,* 53 N. Y. S. 781, where a sea lion, whose native home was in the Pacific Ocean, escaped from captivity in New York and was awarded to a fisherman who caught it in the Atlantic, although such animals were never found in those waters. The difficulties surrounding the subject are illustrated by 1 R. C. L., p. 1067, sec. 9; 3 C. J. p. 20, sec. 10; and Id. p. 21, sec. 11. These authorities are rather confusing than enlightening, and even suggest that one modification of the rule would permit the owner to recover if he could *identify* his property. We know of no case so applying it (save those dealing with bees) and the injustice of its application to one who captures or kills ordinary wild animals which have escaped from restraint and returned to their natural habitat is apparent. Again, Mr. Black's definition of domestic animals as "such as contribute to the support of a family or the wealth of a community" would include all fur bearing animals held in captivity, wherever born or however wild.

We take no notice of such cases as *State v. House,* 65 N. C. 315, 6 Am. Rep. 544, involving larceny of a fur bearing animal, dead or alive, from the trap of its captor; or *Goff v. Kilts,* 15 Wend. (N. Y.) 550, involving recovery of a swarm of bees which had been followed by their owner from their old to their new home; or *Haywood v. State,* 41 Ark. 479, involving the theft of a mocking bird in its cage; or the numerous cases involving the theft of dogs, as they seem to us wholly inapplicable.

It should also be observed that, contrary to the position taken by counsel for plaintiff, liability of the owner of a wild animal which escapes and does damage has no relation to that owner's property right in the animal after escape, notwithstanding the support which it finds in the Harvard Law Review, Vol. XII, p. 346. One who captures a rattlesnake and carries it into his neighbor's house where it bites the neighbor's child is liable in damages, not because it was his snake, but because he placed a dangerous reptile in a position to injure others. Having paid the damage he thereby obtains no right of action against another neighbor who the following day killed the same snake in his potato patch whence it had escaped from its captor. Nor has birth in captivity anything to do with the question. A wild cat may be just as wild if born in a cage as if born on a mountainside.

The only case called to our attention, and apparently the only one in the books, so clearly in point that had it been decided in our own jurisdiction it would be controlling here, is *Campbell v. Hedley,* 39 Ontario Law Reports, 528 (May 17, 1917). There a "patch" fox (which is the "cross" fox hereinbefore referred to) born on the plaintiff's ranch, of the third generation held in captivity, escaped and was shot. In an action to recover the value of its pelt the plaintiff was defeated. That court applied the common law rule, citing Blackstone and Kent, supra, Halsbury's Laws of England, vol. 1, p. 365; C. J. vol. 3, p. 16, Cyc. vol. 2, p. 309, *Mullet v. Bradley, supra,* and various English and Canadian cases, but dismissed

*Ulery v. Jones, supra,* with the statement "I refrain from commenting upon the decision." This opinion is the ablest exposition of the common law rule, applied in modern times, to be found. It is to be noted, however, that it was so inapplicable to present day conditions that the Ontario Legislature found it necessary to correct it by the passage of "An act for the protection of the property in foxes kept in captivity," chap. 65, Statutes of Ontario 16 Geo. V, 1926.

Counsel for defendant, by supplemental brief filed February 17, 1927, calls our attention to the fact that H. B. 367, by the terms of which this fox would be classed as domestic, had passed the lower house of the General Assembly then in session. This he urges as legislative recognition of the existence of the common law rule in Colorado, and argues therefrom the relegation of those in plaintiff's position to that department of the government as their only source of relief. Counsel for plaintiff answering says: (a) McKenzie Duncan was a domestic animal, hence not included in the pending act; (b) if passed, the bill has no application here; (c) the bill may not pass. He is wrong as to (a), right as to (b), and too trustful as to (c). The bill passed with the emergency clause and "safety clutch" and was approved March 17, 1927. It declares all such fur-bearing animals as the one here in question domestic. As set out in counsel's brief it protected title in them and their increase for two years after escape. As finally approved it extends that protection ad infinitum. As the act apparently includes muskrats, which have been known to multiply at the rate of fifteen hundred per cent per annum, contains no provision to prohibit the intermingling of the escaped with the wild, fails to indicate which line shall be deemed legitimate in determining the status of the offspring, and neglects to designate the official or agency to be charged with the duty of sorting, we are fortunate in being relieved of the necessity of construing or applying it in the instant case.

Counsel for defendant further says this common law rule is in force in this jurisdiction by virtue of an act passed by our territorial legislature in 1861. ''The common law of England, so far as the same is applicable and of a general nature, * * * shall be the rule of decision, and shall be considered as of full force until repealed by legislative authority.'' Sec. 6516, p. 1698, C. L. 1921.

Applicability as to past or to future conditions would often be difficult, if not impossible, of ascertainment. That it is to be determined when claimed is clearly indicated by the language of Mr. Justice Beck, who, speaking for the court nineteen years after the passage of the statute, in a case where the common law rule as to damage done by trespassing cattle was involved, said: ''such a rule of law is wholly unsuited and inapplicable to the present condition of the state and its citizens.'' *Morris v. Fraker,* 5 Colo. 425, 428.

For the reasons hereinbefore pointed out we think it equally clear that the common law rule now invoked ''is wholly unsuited and inapplicable to the present condition of the state,'' the transaction in question, and the industry out of which it grew.

Having then neither statute nor applicable common law rule governing the case we must so apply general principles in the light of custom, existing facts, and common knowledge, that justice will be done. So the courts of England and the United States have acted from time immemorial and so the common law itself came into existence.

Counsel for defendant concedes he would have no title had the fox been released by a stranger or killed by one informed of its ownership. The thread is too frail to support its burden. McKenzie Duncan was held in captivity, semi-domesticated, escaped by accident, fled against the will of his owner, and pursuit was abandoned by compulsion. This defendant in fact had, or is charged with, knowledge that the pelt purchased was the product

of a vast, legitimate, and generally known industry; that it had a considerable and easily ascertainable value; that it bore the indicia of ownership; that it had been taken in an unusual way; that the seller was not the owner; that no right of innocent purchasers had intervened; and that it was from an animal taken in a locality where its kind ferae naturae was unknown and in a state where large numbers were kept in captivity.

We are loath to believe that a man may capture a grizzly bear in the environs of New York or Chicago, or a seal in a mill pond in Massachusetts, or an elephant in a corn field in Iowa, or a silver fox on a ranch in Morgan County, Colorado, and snap his fingers in the face of its former owner whose title had been acquired by a considerable expenditure of time, labor and money; or that the rule which requires that where one of two persons must suffer the loss falls upon him whose carelessness caused it, has any application here. If the owner was negligent in permitting the escape the dealer was even more reckless in making the purchase.

Under all the circumstances of this case we feel obliged to hold that the defendant obtained no title which it can maintain against the plaintiff.

The judgment is accordingly affirmed.