Argued and submitted June 17, affirmed on appeal and on cross-appeal
August 10, 1994

Johnnie HOGAN,
*Respondent - Cross-Appellant,*

*v.*

Armand GRIDELLI,
*Appellant - Cross-Respondent.*

(16-92-06163; CA A80931)

879 P2d 896

Linda J. Kessel argued the cause for appellant - cross-respondent. On the briefs were Dennis W. Percell and Arnold Gallagher Saydack Percell & Roberts, P.C.

Douglas G. Schaller argued the cause for respondent - cross-appellant. With him on the briefs was Johnson, Clifton, Larson & Corson, P.C.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

De MUNIZ, J.

## De MUNIZ, J.

Defendant appeals from a judgment awarding plaintiff double damages in an action brought pursuant to ORS chapter 609. Plaintiff cross-appeals, claiming that the trial court erred in striking his claim for, and refusing to give the jury an instruction on, strict liability. We affirm on both appeals.

Plaintiff breeds and raises gamecocks. On August 12, 1990, two of defendant's dogs entered plaintiff's property and attacked and killed some of plaintiff's gamecocks. Plaintiff discovered the dead gamecocks while defendant's dogs were still on his property. He shot and killed the two dogs when they would not leave his property. As a result of the dog attack, 83 gamecocks were killed or had to be destroyed. On July 29, 1992, plaintiff filed this lawsuit. After a trial, a jury found for plaintiff, and the court awarded him double damages of $46,400, pursuant to ORS 609.140(1).[1]

Defendant makes five assignments of error. In his first two assignments, defendant argues that the trial court erred in ruling that gamecocks are livestock, within the meaning of ORS 609.010, and in instructing the jury that the gamecocks were domesticated fowl and livestock for purposes of ORS chapter 609. Defendant asserts that gamecocks are not domesticated fowl, because they are not habituated to living with humans and are not a significant part of plaintiff's livelihood. Defendant further argues that the legislature did not intend to include gamecocks in the definition of livestock, because gamecocks are treated as a separate category of fowl in other statutes. Finally, defendant cites statutes and case law from other states as authority that gamecocks are not domesticated fowl, because they serve no socially useful purpose and are not specifically protected by statute.

■     Our task in interpreting a statute is "to discern the intent of the legislature." *PGE v. Bureau of Labor and*

---

[1] ORS 609.140(1) provides:

"The owner of any livestock which has been damaged by being injured, chased, wounded or killed by any dog shall have a cause of action against the owner of such dog for the damages resulting therefrom, including double the value of any livestock killed and double the amount of any damage to the livestock."  ·

*Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). To do so, we first examine the text and context of the statute, including provisions of the same statute and other related statutes. 317 Or at 611. We also consider the rules of construction mandated by statute or case law. 317 Or at 611. If the legislature's intent is clear from that inquiry, no further inquiry is necessary. 317 Or at 611.

■ ORS 609.010 (*since amended by* Or Laws 1993, ch 252, § 6) provides, in part:

"(1) As used in ORS 609.140 to ORS 609.190, 'livestock' means horses, mules, jackasses, cattle, llamas, sheep, goats, swine, *domesticated fowl* and any fur-bearing animal bred and maintained commercially or otherwise, within pens, cages and hutches." (Emphasis supplied.)

The term domesticated fowl is not defined. However, when we interpret a statute, we usually give words of common usage their plain, natural and ordinary meaning. *Griffin v. Tri-Met*, 318 Or 500, 508, 870 P2d 808 (1994). Defendant argues that we should use the definitions of domestic animal in *Black's Law Dictionary* and the *Restatement (Second) of Torts* § 506(2) (1977) in ascertaining the meaning of domesticated fowl. But the statute says domesticated fowl, not domestic animals. The common meanings of domesticate and fowl are more illustrative of the meaning that the legislature intended when it included domesticated fowl in ORS 609.010(1).

■ The verb domesticate, when used in connection with animals or plants, generally means to adapt to live with humans or for human use. *Webster's Third New International Dictionary* 671 (unabridged 1976). Humans domesticate animals by modifying their growth and traits through the provision of food, protection from predators and selective breeding over generations. *Webster's Third New International Dictionary* 671 (unabridged 1976). Fowl is a synonym for bird. *See Webster's Third New International Dictionary* 899 (unabridged 1976). We can combine the common meanings of domesticate and fowl to infer the meaning of domesticated fowl. That is, domesticated fowl are birds that have been adapted to live with humans or for human use.

Moreover, the meaning of the term domestic fowl provides greater insight into the meaning of domesticated fowl

than domestic animals, because it pertains particularly to fowl. Domestic fowl means poultry, or a bird of one of the breeds developed from the jungle, including those bred for meat production, egg laying, fighting or purely for show. *Webster's Third New International Dictionary* 671 (unabridged 1976). That definition and the common meanings of domesticate and fowl indicate that domesticated fowl, as used in ORS 609.010(1), means birds that are bred and raised for human benefit or use. Because gamecocks may be bred for human benefit or use, such as sale, show or fighting, they are domesticated fowl.

■ The context in which the term domesticated fowl occurs supports that interpretation. ORS 609.010(1) defines livestock for the purposes of ORS 609.140 to ORS 609.190. ORS 609.010(1). That statutory scheme gives an aggrieved owner a choice of remedies when a dog damages the owner's livestock: Either seek expeditious relief from a county with a dog control program, pursuant to ORS 609.170 and ORS 609.180, or search for and sue the owner of the offending dog for damages, including double damages, pursuant to ORS 609.140. *See Columbia County v. Randall*, 49 Or App 643, 648, 620 P2d 937 (1980). The statutory scheme evinces a legislative intent to insure that owners of certain types of property, that are particularly susceptible to attacks by dogs, are compensated for damages to that property caused by dogs.

■ The fact that ORS 167.355(3)[2] specifically exempts the breeding and rearing of gamecocks from the crime of

---

[2] ORS 167.355 provides, in part:

"(1) A person commits the crime of involvement in animal fighting if the person:

"(a) Owns or trains an animal with the intention that the animal engage in an exhibition of fighting; or

"(b) Promotes, conducts, participates in or is present as a spectator at an exhibition of fighting or preparations thereto; or

"(c) Keeps or uses, or in any way is connected with or interested in the management of, or receives money for the admission of any person to any place kept or used for the purpose of an exhibition of fighting; or

"(d) Knowingly suffers or permits any place over which the person has possession or control to be occupied, kept or used for the purpose of an exhibition of fighting.

"* * * * *

"(3) Nothing in this section applies to or prohibits any customary practice of breeding or rearing game cocks even though those cocks may be subsequently used in cock fighting exhibitions outside the State of Oregon * * *."

involvement in animal fighting indicates that the legislature sought to preserve and protect that enterprise. The inclusion of gamecocks within the meaning of domesticated fowl and the definition of livestock furthers that purpose and comports with the purpose of protecting property susceptible to damage by dog attacks evinced in ORS 609.140 to ORS 609.190. Thus, both the narrow and broader statutory contexts also indicate that the legislature intended to include gamecocks within the meaning of domesticated fowl and the definition of livestock in ORS 609.010(1). We need not resort to statutes or case law from other jurisdictions to discern the meaning of those terms.

It is undisputed that plaintiff was in the business of breeding and raising gamecocks. Because plaintiff's gamecocks were the basis of his business, they were being raised for human benefit or use, and, thus, they are both domesticated fowl and livestock under ORS 609.010(1). The trial court did not err in ruling that gamecocks are domesticated fowl and livestock and in instructing the jury accordingly.

■ In his third and fourth assignments, defendant argues that "[t]he trial court erred in ruling that the jury could not consider evidence of illegal activities as a factor in determining damages" and in refusing to give defendant's requested jury instruction on the effect of illegal activities on the measure of damages.[3] Defendant asserts that the measure of damages for plaintiff's gamecocks is their value in lawful use, and that training or fighting gamecocks is an illegal use in Oregon.

■ ■ When a plaintiff seeks to recover damages for the value of destroyed property, the proper measure of damages is the market value of the property. *Prettyman v. Railway Etc. Co.,* 13 Or 341, 343, 10 P 634 (1886). In addition, a plaintiff generally cannot recover damages derived from an illegal activity. *Cf. Gibbs v. United Mine Workers of America,* 343 F2d 609 (6th Cir 1965), *rev'd on other grounds* 383 US 715, 86 S Ct 1130, 16 L Ed 2d 218 (1966) (profit estimates that

---

[3] Defendant's Requested Instruction No. 9 was:

"DAMAGES

"A person is entitled to the legal value of his property as the measure of damages and is not permitted to recover for its illicit value, if any."

contemplate illegal operations will not support damage award); *Shelley v. Hart*, 112 Cal App 231, 297 P 82 (1931). In Oregon, it is illegal to fight gamecocks, but it is not illegal to breed and raise gamecocks for use in gamecock fights outside the state. ORS 167.355.

The evidence shows that a variety of factors can affect the market value of a gamecock. A poultry specialist testified that, in evaluating the destroyed birds, she considered the performance of cross-bred gamecocks owned by plaintiff in "major venues" and information from periodicals describing his winnings. Another witness, who is a poultry breeder and consultant, testified that "gameness," or the desire to overcome and never yield, affects a gamecock's market value. Other factors that can affect a gamecock's market value include: the gamecock's parentage, the fighting performance history of the gamecock and genetically related gamecocks, and the reputation of the breeder.

There is no evidence that any of the 83 gamecocks involved here ever fought in Oregon. As noted above, ORS 167.355(3) permits an individual to raise gamecocks for sale and fighting outside the State of Oregon. Thus, plaintiff was involved in a legal activity and is entitled to recover the market value of the 83 gamecocks, including their market value for fighting outside of Oregon. Neither the trial court's ruling nor its refusal to give defendant's requested instruction was error.

■ In his fifth assignment, defendant argues that the trial court erred in denying his request for a mistrial, because plaintiff intentionally interjected evidence of insurance into his testimony and that evidence is likely to have prejudiced defendant.

During trial, plaintiff responded to a question from his attorney, "We talked about, I asked him did he have insurance, and we — [.]" At that point, defendant's attorney interrupted plaintiff and requested a recess. After the jury left the courtroom, defendant's attorney moved for a mistrial, which the trial court denied. The trial court noted that "[the fact that] the plaintiff [was] told that he was not to mention [insurance] * * * suggests that at least *on the face of it*, that any mention of insurance was advertent * * *." (Emphasis

supplied.) However, the trial court subsequently found, "based on the particular characteristics of this particular witness, that [plaintiff's mention of insurance] wasn't intentional * * *." It further concluded there was little likelihood of prejudice to defendant, because there was no specific indication whether defendant had insurance.

We review the denial of a motion for a mistrial for an abuse of discretion. *Lunski v. Lindemann,* 270 Or 316, 321, 527 P2d 254 (1974). The mere mention of insurance, without any suggestion whether a party is covered, does not necessarily require a mistrial. *DeSpain v. Bohlke,* 259 Or 320, 323, 486 P2d 545 (1971). In *DeSpain,* an expert witness for the plaintiff in a personal injury lawsuit answered a question from the defendant's attorney by explaining how hounding by an insurance company can affect a patient. 259 Or at 322. The court noted that insurance was a collateral issue, irrelevant to the issues framed by the pleadings, and that the witness did not say that the defendant was insured. 259 Or at 322-23. The court held that the probability of prejudice to the defendant was too remote to require reversal. 259 Or at 323.

Here, as in *DeSpain,* there was no evidence indicating whether defendant was insured. The trial court found that plaintiff did not intentionally mention insurance. Under the circumstances, we conclude that it is unlikely that plaintiff's fleeting mention of insurance prejudiced defendant. The trial court did not abuse its discretion in denying defendant's motion for a mistrial.

The trial court dismissed plaintiff's strict liability claim. Because we affirm, we need not reach plaintiff's cross-appeal regarding that dismissal.

Affirmed on appeal and on cross-appeal.