IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

JOEL GOLDBERGER, et al., *Plaintiffs/Appellants*,

*v.*

STATE FARM FIRE AND CASUALTY COMPANY, *Defendant/Appellee*.

No. 1 CA-CV 18-0112
FILED 8-13-2019

Appeal from the Superior Court in Coconino County
No. S0300CV201700313
The Honorable Jacqueline Hatch, Judge, *Retired*

**REVERSED AND REMANDED**

COUNSEL

Hunter Humphrey & Yavitz PLC, Phoenix
By Randall S. Yavitz, Isabel M. Humphrey
*Counsel for Plaintiffs/Appellants*

Broening Oberg Woods & Wilson PC, Phoenix
By Robert T. Sullivan, John C. Quinn, Alicyn M. Freeman
*Counsel for Defendant/Appellee*

_____

## OPINION

Judge Michael J. Brown delivered the opinion of the Court, in which Presiding Judge Diane M. Johnsen and Judge Jennifer M. Perkins joined.

_____

**B R O W N**, Judge:

¶1         In this opinion we address whether the superior court properly dismissed an insurance claim for property damage caused by feral cats based on a domestic-animal exclusion in the insurance policy at issue. Because the feral cats that caused the damage are not domestic animals under all reasonable interpretations of the facts alleged in the complaint, the court erred in granting the insurer's motion to dismiss. We therefore reverse and remand for further proceedings.

## BACKGROUND

¶2         Joel and Kim Goldberger ("the Goldbergers") own residential rental property in Flagstaff, insured by State Farm Fire and Casualty Company ("State Farm") under a rental dwelling policy ("Policy"). The Goldbergers filed a claim asserting their tenant "allowed" feral cats "to access" the property and the cats then caused approximately $75,000 of "accidental damage." State Farm denied the claim, asserting "feral cats are domestic animals and therefore the damage was not covered under the Policy."

¶3         The Goldbergers then filed this lawsuit, alleging breach of contract and insurance bad faith. State Farm moved to dismiss the complaint for failure to state a claim, arguing the Policy's plain language precluded coverage. State Farm based its denial of coverage on subsection 1.N of the Policy ("Exclusion"), which provides that accidental losses caused by "birds, vermin, rodents, insects or domestic animals" are not covered. The superior court granted the motion, reasoning in part: (1) a cat, feral or not, is a domestic animal; (2) these feral cats were acting as if they were domesticated; and (3) a reasonably intelligent consumer would understand the Exclusion to unambiguously apply to damage caused by feral cats. This timely appeal followed.

## DISCUSSION

**¶4** A party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Ariz. R. Civ. P. 12(b)(6). In evaluating a claim's sufficiency, we take as true "all well-pleaded factual allegations and indulge all reasonable inferences from those facts," but need not accept conclusory statements. *Coleman v. City of Mesa*, 230 Ariz. 352, 356, ¶ 9 (2012). A court should dismiss a claim only if, under any interpretation of the well-pleaded facts, the plaintiff would not be entitled to relief. *Id.* at ¶ 8. Our review is de novo. *Id.* at 355, ¶ 7.

**¶5** Several of State Farm's arguments rely on the assumption that these cats were peaceably living in the home with the tenant. The superior court, at least in part, appeared to follow State Farm's lead. A court deciding a Rule 12(b)(6) motion, however, must "look only to the pleading itself," *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419, ¶ 7 (2008), including documents that "are central to the complaint," *Strategic Dev. & Constr., Inc. v. 7th & Roosevelt Partners, LLC*, 224 Ariz. 60, 64, ¶ 14 (App. 2010), such as the Policy. Because we limit our review to the complaint and the Policy, we proceed without characterizing the feral cats' behavior or any care the tenant may have afforded them beyond what the complaint alleges—that the tenant "allowed [the cats] to access the property." To the extent State Farm's arguments on appeal depend on facts not alleged in the complaint, they necessarily fail.

### A. Interpretation of the Exclusion

**¶6** We review de novo the interpretation of an insurance policy. *Teufel v. Am. Family Mut. Ins. Co.*, 244 Ariz. 383, 385, ¶ 10 (2018). A policy term is ambiguous if it is susceptible to two or more reasonable interpretations that conflict. *Id.* We examine policy language "from the viewpoint of one not trained in law or in the insurance business." *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 534 (1982). But "even if a policy is apparently ambiguous, a decision to require coverage follows [only] after consideration of 'legislative goals, social policy, and examination of the transaction as a whole.'" *Emp'rs Mut. Cas. Co. v. DGG & CAR, Inc.*, 218 Ariz. 262, 264, ¶ 9 (2008) (citation omitted); *see also Teufel*, 244 Ariz. at 386, ¶ 17 (noting a court may consider common meanings and an insured's reasonable expectations when resolving an apparent ambiguity). At the end of our inquiry, we must construe any remaining ambiguity against the insurer, "particularly when the ambiguity involves an exclusionary clause." *Teufel*, 244 Ariz. at 385, ¶ 10.

¶7        The Goldbergers argue the superior court erred in dismissing their complaint because the phrase "domestic animals" is reasonably susceptible to differing interpretations and therefore must be construed against State Farm.  According to State Farm, the Exclusion is susceptible to only one reasonable interpretation; alternatively, it contends that any ambiguity remaining after considering the Policy's overall purpose must be resolved in its favor.

¶8        Although the Policy does not define "domestic animals," the parties offer multiple definitions.  The Goldbergers contend the term could reasonably refer to either (1) animals belonging to a broader class of animals that have been domesticated at some point in history (the "species-based definition") or (2) animals that are, in fact, kept by a person for any of various purposes, including as pets (the "individualized definition").  State Farm argued for the species-based definition in the superior court, which appeared to agree with that definition.  In its appellate briefing, State Farm supplied a third definition, asserting the phrase can only reasonably refer to "dogs [and] cats, as well as a broader class of animals reasonably expected to be found in or around a dwelling."  And at oral argument, State Farm asserted that regardless of the outer limits of what "domestic animals" means, it includes all dogs and cats.

¶9        State Farm first points to a federal case interpreting the same policy language in the context of property damage allegedly caused by "feral" cats.  *Bjugan v. State Farm Fire & Cas. Co.*, 969 F. Supp. 2d 1283 (D. Or. 2013), *aff'd sub nom. Bjugan v. State Farm Fire & Cas. Ins. Co.*, 644 Fed. Appx. 789 (9th Cir. 2016).  Despite a surface-level similarity, the case is distinguishable.  *Bjugan* was decided on summary judgment, and "involve[d] a renter who *maintained . . . ninety-five* cats and two dogs in a rental house and the manner in which the animals were *maintained* resulted in physical damage to the house." 969 F. Supp. 2d at 1284–85 (emphasis added).  The fact that the cats were being "maintained" by the renter, who actually "acknowledge[d] she knew there were cats doing damage" and "tried to prevent that whenever she was aware of it occurring," *id.* at 1288, means the cats were so obviously domestic animals that the court's additional plain-meaning analysis is of limited utility.  Put differently, the cats in *Bjugan* would be domestic animals under both the individualized and species-based definitions proposed here.[1]

---

[1]        The only other case we are aware of that found the term "domestic animals" unambiguous is *Smith v. State Farm Fire & Cas. Co.*, 381 So. 2d 913

4

¶10 Instead, at least initially, we conclude "domestic animals" as used in the Exclusion is ambiguous because it has at least two conflicting interpretations, both reasonable. Under the species-based definition, the animal's species is dispositive, meaning its current habitat and whether a human cares for it are irrelevant. Under the individualized definition, the opposite is true. We resolve this ambiguity by examining the "transaction as a whole," including the Policy's language and purpose, public policy considerations, the parties' intent, and the insured's reasonable expectations.[2] *Teufel*, 244 Ariz. at 386, ¶ 17; *State Farm Mut. Auto. Ins. Co. v. Wilson*, 162 Ariz. 251, 257–58 (1989).

¶11 "We start with the policy's language." *Teufel*, 244 Ariz. at 387, ¶ 18 (assigning common meaning *after* finding the policy language ambiguous). Broadly stated, an "animal" is "any living creature (besides plants) other than a human being." *See, e.g.*, *Animal*, Black's Law Dictionary (10th ed. 2014). And the adjective "domestic" means "[o]f, relating to, or involving the family or the household." *See, e.g.*, *Domestic*, Black's Law Dictionary (10th ed. 2014). Used together, the two words presumably refer to animals that relate to or involve the family or the household—pets and other animals kept in or around a household—as some dictionaries confirm. *See, e.g.*, *Domestic Animal*, Cambridge Advanced Learner's Dictionary (4th ed. 2013) ("[A]n animal that is not wild and is kept as a pet or to produce food."); *Domestic*, New Oxford American Dictionary (3d ed. 2010) ("(of an animal) tame and kept by humans . . . .").

¶12 Other dictionaries, however, suggest the compound term "domestic animals" broadly refers to animal species that, as a matter of common knowledge, have long lived peaceably with humans. *Domestic Animal*, Webster's Third New International Dictionary (unabridged ed.

---

(La. Ct. App. 1980). But *Smith* involved a cow kept by the insured that fell into the insured's swimming pool, *id.* at 913, and so it is an even clearer case than *Bjugan*. Thus, neither case is persuasive here.

[2] Neither party has identified, nor has our research revealed, any legislative goals that would assist us in interpreting the meaning of "domestic animals." And no statute or binding legal precedent purports to define the phrase "domestic animals" in the specific context of insurance. *See First Am. Title Ins. Co. v. Johnson Bank*, 239 Ariz. 348, 352, ¶ 20 (2016) (finding the statutory definition of "title insurance" not helpful in interpreting valuation date for covered loss). In addition, "no other evidence establishes any particular meaning mutually intended by the contracting parties." *Id.* at 351, ¶ 13.

1993) ("[A]ny of various animals (as the horse, ox, sheep) which have been domesticated by man so as to live and breed in a tame condition . . . ."); *Domestic Animal*, Black's Law Dictionary (10th ed. 2014). And other definitions are inherently ambiguous as to whether an animal's classification occurs on a species or individual level. *See, e.g.*, *Domestic*, The American Heritage Dictionary (5th ed. 2011) (referring to animals that are "[t]ame or domesticated").

¶13 Although the dictionaries variously adopt individualized or species-based definitions, the weight of them lean toward an individualized definition. When construing an insurance policy, we should be cautious in embracing a definition from legal dictionaries that may define the term "domestic animals" in a technical legal sense, *cf. New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539–40 (2019), which would conflict with the principle that we interpret policy language from the perspective of one "untrained in law or business," *Teufel*, 244 Ariz. at 385, ¶ 10. Indeed, that Black's definition also refers the reader to the Latin term of art "domitae naturae" is at least some evidence that this might be true. *Domestic Animal*, Black's Law Dictionary (10th ed. 2014). On this score, other courts have noted that a static species-based approach, under which no animal belonging to a species once domesticated may ever be considered wild again, might be correct scientifically, but is not so easily squared with common understandings. *See Butler v. City of Palos Verdes Estates*, 37 Cal. Rptr. 3d 199, 206 (App. 2005); *see also Gallick v. Barto*, 828 F. Supp. 1168, 1170 n.2 (M.D. Penn. 1993).

¶14 We also consider it relevant that the Exclusion applies to "domestic animals," not "domesticated animals." Modern usage draws a distinction between "domestic animals"—a term referring to a single animal's present status—and "domesticated animals"—a term referring to historical facts about the species generally. *See* Brian A. Garner, *Garner's Modern American Usage* 268 (2d ed. 2003) ("A *domestic* animal is a pet . . . that lives with the family. A *domesticated* animal is a formerly wild animal that has long been bred for human use . . . ."); *see also Hogan v. Gridelli*, 879 P.2d 896, 898 (Or. Ct. App. 1994) (recognizing the distinction between "domestic" and "domesticated" and concluding that "domesticated" refers to species that "have been adapted to live with humans or for human use"). Had State Farm intended the Exclusion to apply to all species of animals domesticated at some point in history, it could have easily said so.

¶15 We find additional confirmation that the individualized definition has the better claim to common meaning given that the legislature has so defined the phrase in two different contexts. *See* Ariz.

Rev. Stat. ("A.R.S.") §§ 11-251(47) (defining "domestic animal" as one "kept as a pet and not primarily for economic purposes"); 12-558.02(C) (defining "domestic animal" as "a dog, a cat or another animal that is domesticated and kept as a household pet"). Although addressing other circumstances, these statutes are further evidence that the individualized definition is more logical.

¶16 The other words in the Exclusion ("birds, vermin, rodents, insects") do not lead us to a different conclusion. Although we often interpret doubtful words by referring to accompanying words, *Estate of Braden ex rel. Gabaldon v. State*, 228 Ariz. 323, 326, ¶ 8 (2011), the other words of the Exclusion are so different in kind from the term "domestic animals" that they shed little light on its most reasonable interpretation. Each of them names an animal, or group of animals, that a homeowner normally seeks to exclude from the home, but—under any definition—"domestic animals" are just the opposite. For this reason, the canon *ejusdem generis* is also not helpful here. *See id.* At most, each preceding word in the Exclusion could refer to a wide category of animals, a usage that *might* favor a species-based definition. But, then again, whether a particular animal is "vermin" would appear to call for an individual determination in most cases. *See Christ Episcopal Church of Bastrop v. Church Ins. Co.*, 731 So. 2d 1071, 1074 (La. Ct. App. 1999) ("In each case, the courts determined that whether a particular creature is clearly or unambiguously vermin is a case-by-case inquiry turning upon the generally understood meaning of the term." (collecting cases)); *Vermin*, The American Heritage Dictionary (5th ed. 2011) ("Various small animals . . . that are destructive, annoying, or injurious to health.").

¶17 The Policy's purpose and how its provisions work together as a whole lend further support to the conclusion that the individualized definition of "domestic animals" is the most reasonable one. *See Nichols v. State Farm Fire & Cas. Co.*, 175 Ariz. 354, 357 (App. 1993) ("A contract of insurance . . . is not a collection of separate unrelated parts; each part must be read and interpreted in connection with all other parts.").

¶18 The Goldbergers argue that under State Farm's definition, the Exclusion would swallow the Policy's apparent general coverage of damages caused by animals. According to State Farm, though, the Exclusion—just like the other exclusions in the Policy—is designed to exclude from coverage damages that an insured can easily detect and prevent. State Farm's proffered purpose comports with the purpose of insurance generally but does not support its argument here.

¶19        In some sense, all "[i]nsurance policies are purchased 'as protection against calamity.'" *Transamerica Ins. v. Meere*, 143 Ariz. 351, 355 (1984) (citation omitted).  The idea is that an "insured seeks the safety of insurance against risks that are outside his control and the insurer agrees to cover for a premium based on actuarial calculations of the random occurrence (risk) of such events in a given population." *Id.* at 355–56.  This concept is central to the definition of insurance itself and to the origin of property insurance.  *See* A.R.S. § 20-103(A); 10A Couch on Insurance § 148:1 ("Historically, property insurance grew out of the insurance against the risk of fire which became available for ships, buildings, and some commercial property at a time when most of the structures in use were made wholly or primarily of wood.").

¶20        The Policy's basic coverage provisions insure the Goldbergers' dwelling, structures attached to the dwelling, certain construction materials, carpeting, outdoor antennas, a limited amount of personal property on the premises, and miscellaneous additional coverages, including loss of rents.  The Policy promises coverage for accidental direct physical loss to the real and personal property unless a provision of "Section I – Losses Not Insured" applies.  As the name suggests, Section I enumerates certain types of losses the Policy does not cover, including those caused by "birds, vermin, rodents, insects or domestic animals."  Because no other provision excepts animal-caused damage from the promised coverage, the clear inference is that all accidental animal damage is covered unless the Exclusion applies. *Cf. Estate of Tovrea v. Nolan*, 173 Ariz. 568, 573 (App. 1992) ("[T]he statement of one exception implicitly denies the existence of other unstated exceptions.").

¶21        What this means is that the Policy would not, for example, exclude coverage for exotic pets unless "domestic animals" is construed to have an individualized definition.  While not common, one can imagine an insured keeping a nontraditional animal such as a snake, cougar, monkey, or even a bear in the home or in an associated structure.  *See, e.g., Lakeshore Hills, Inc. v. Adcox*, 413 N.E.2d 548, 549 (Ill. App. Ct. 1980) (describing a defendant who kept a pet "12-year-old, 575-pound Canadian black bear" on his property); *Turudic v. Stephens*, 31 P.3d 465, 472 (Or. Ct. App. 2001) (finding that keeping cougars as "family pets" was a permissible "residential use" under restrictive covenants governing the property).  When such a pet behaves badly, under the species-based definition, an insurer would have to cover the resulting damage because the pet belongs to a species that has never been domesticated, and no other exception applies.  Under an individualized definition, though, the Exclusion would preclude coverage in each instance because the pet animal is "domestic,"

given that the insured exercises care and control over it. Adopting the species-based definition would therefore create a nonsensical outcome resulting in coverage even though the insured was in the best position to prevent damage. Thus, the individualized definition yields the most reasonable construction because it encourages the insured to prevent damage by controlling an animal that he or she willingly brings into the home.

¶22 If, as State Farm now asserts, the general purpose of the Policy is to provide coverage for accidental losses and the specific purpose of the Exclusion is to except from coverage damages that an insured can easily detect and prevent, then in the abstract, it is difficult to see how excluding damage caused to the dwelling by feral animals—living in the wild with no owner or keeper—would serve that purpose. There is nothing predictable about when such an animal, lacking an owner or keeper and living in nature, might damage a dwelling. And a homeowner has little, if any, meaningful ability to control such animals should they happen to wander onto the property. Of course, if a homeowner endeavors to keep such an animal, then he or she is charged with responsibility for it. At oral argument, however, State Farm asserted that a species-based definition of the Exclusion would exclude coverage for damages to a dwelling caused by a wild horse, but allow coverage when the damages are caused by a skunk an owner keeps as a pet (assuming a skunk is neither vermin nor a rodent). This result conflicts with the purposes of the Exclusion—to exclude coverage of damages for which the insured has some degree of control but cover damages caused by risks outside the insured's control. Only an individualized definition can properly serve those purposes.

¶23 Caselaw also supports an individualized approach. In *Farmers Insurance Exchange v. Loesche*, 17 Ariz. App. 421 (1972), the insured died while driving a "one-half ton" truck furnished to him by his employer "for the exclusive purpose of transporting himself between" his employer's pay telephones to make collections. *Id.* at 422. His insurer denied coverage because the truck was a "commercial vehicle" and the policy did not apply to death sustained by a person driving a commercial vehicle in the course of his occupation. *Id.* at 423. The insured's estate argued that because the term "commercial vehicle" was not defined, it was ambiguous and had to be construed in favor of coverage. *Id.* We disagreed, explaining that "most courts analyze the character of the use of the vehicle taken into consideration with the form of the car in determining whether there is liability." *Id.* (collecting cases). "[T]he mere fact that a certain vehicle can be used for personal purposes," we elaborated, "is not conclusive in determining whether a vehicle is 'commercial.' It is the character of the use

that is crucial." *Id.* at 424. Applying this "common-sense reading," we found that this individualized definition left no ambiguity in the undefined term. *Id.* at 423–24. That same "common-sense reading" resolves the apparent ambiguity at issue in this case.

¶24 Outside the insurance context, other courts have recognized that animals living and breeding in the wild do not fall within the common understanding of "domestic animals." *See Butler*, 37 Cal. Rptr. 3d at 205–06. In *Butler*, a group of citizens sued the city for maintaining "a program to manage the size of a feral peafowl population that inhabited parklands and canyon property owned by the municipality." *Id.* at 201. The peafowl in question had been brought to the city by its former mayor, who "maintained them in a pen behind his home." *Id.* After the mayor's death, the birds were released into the wild. *Id.* The court recognized that "while the peafowl originally brought to Palos Verdes Estates may have been domesticated, their progeny [were] not," because decades later no one provided the birds with food, protected them from their enemies, or facilitated their reproduction. *Id.* at 205. The court specifically rejected, as reflecting a technical as opposed to ordinary understanding, the proposition State Farm offers here—that the offspring of a domesticated animal can never again be considered wild. *Id.* at 205–06.

¶25 And the reverse is also true: though an animal belongs to a species never before domesticated, individual members of that species may become "domestic." *See E.A. Stephens & Co. v. Albers*, 256 P. 15, 18 (Colo. 1927). The plaintiff in *Albers* sought replevin of a silver fox's pelt. *Id.* at 15. The fox was "of the second generation born in captivity" on the plaintiff's ranch, its left ear marked with a tattoo for identification. *Id.* When the fox escaped from its pen, the plaintiff pursued it until nightfall, but the fox was eventually killed by a local rancher. *Id.* The rancher gave the pelt to a trapper, who sold it to the defendant. *Id.* at 15–16. The defendant argued that because foxes are wild animals, the plaintiff's title to the fox ended when it escaped its pen and was killed. *Id.* at 16. Responding that this fox was a domestic animal, plaintiff contended her ownership continued even after the fox's escape. *Id.* The court rejected the defendant's argument that "whether an animal be wild or domestic must be determined from the species, not from the individual." *Id.* at 16. Instead, applying "general principles in the light of custom, existing facts, and common knowledge," it affirmed judgment for the plaintiff because the fox "was held in captivity, semidomesticated, escaped by accident, fled against the will of his owner, and pursuit was abandoned by compulsion." *Id.* at 18. In other words, even though the fox would not be a "domestic animal" under a species-based

approach, the court considered it "domestic" under an individualized approach.

¶26 Public policy considerations also militate in favor of an individualized definition because that approach provides greater certainty to insureds about the coverages they buy, whereas the indeterminate nature of a species-based definition necessarily leaves them to speculate about coverage. Whether a particular species is "domestic" necessarily depends on little more than common knowledge, a criterion that may be useful in the most obvious of cases, but not among fringe cases. The extent of a species' domestication is often a question of degree, a subject on which reasonable minds can differ. Definitions that purport to encompass all animals that are tame or capable of being tamed fare no better in this regard. Bears can be taught to balance balls on their noses and certain elephants can perch on a pedestal. State Farm's attempt to furnish a limiting principle by arguing that "domestic animals" includes those "animals reasonably expected to be found in or around a dwelling" is equally unavailing. The animals in this definition would change depending on geography; one might not reasonably expect to see a bear around a dwelling in Phoenix, but bears are not so rare in some Flagstaff neighborhoods. No language in the Policy tells the insured that the scope of coverage could depend on such a factor. In short, the species-based definition offers no meaningful limit on the scope of the Exclusion, preventing consumers from knowing what they purchased.

¶27 Based on the foregoing, we conclude that the term "domestic animals" as used in the Policy is ultimately not ambiguous. Instead, the term encompasses specific animals that are subject to the care, custody, and control of a person.

¶28 The Goldbergers' complaint alleges the cats that damaged their dwelling were "feral" and were "allowed to access the property by their tenant." On this alone, we cannot say that the tenant, or anyone else, was keeping the feral cats in such a manner that the Exclusion precludes coverage. Resolving all reasonable inferences in the Goldbergers' favor, *Cleckner v. Ariz. Dep't of Health Services*, 246 Ariz. 40, 42, ¶ 6 (App. 2019), we must presume that the cats were feral, meaning they had no owner or keeper and were living in nature. *See, e.g., Feral*, The American Heritage Dictionary (5th ed. 2011) ("Existing in a wild or untamed state."). And the allegation that the tenant allowed the cats to access the property does not show the tenant exercised sufficient care, custody, and control over the cats so as to render them "domestic animals." Therefore, because the facts alleged in the complaint and the reasonable inferences drawn therefrom are

within the Policy's coverage, the superior court erred in dismissing the complaint.

**¶29** During discovery, of course, additional facts may reveal that the tenant was actually keeping or maintaining these cats like the tenant in *Bjugan*. We need not explore all the possible purposes for which a domestic animal may be kept. Suffice it to say that whether a particular animal falls within the Exclusion would normally be a factual question, depending on the purpose for which the animal is kept and the amount of care, custody, or control a person exercises over the animal. *Cf. Spirlong v. Browne*, 236 Ariz. 146, 151, ¶ 17 n.4 (App. 2014) (collecting cases). Those or other facts may ultimately bring this case outside the Policy's coverage, *see Teufel*, 244 Ariz. at 389, ¶ 29, but they await factual development.

### B.    Reasonable Expectations of the Insured

**¶30** The superior court also rejected the Goldbergers' alternative argument that even if the term "domestic animals" unambiguously includes feral cats, that result would violate the objectively reasonable expectations of the average insured. The reasonable expectations doctrine applies only when unambiguous boilerplate terms in an insurance contract result in a denial of coverage. *See Gordinier v. Aetna Cas. & Sur. Co.*, 154 Ariz. 266, 272–73 (1987). Because we have rejected State Farm's contention that the Exclusion necessarily applies to all feral cats, we need not address the merits of this alternative argument.

## CONCLUSION

**¶31**          Because the Goldbergers have alleged facts that, if proven, would entitle them to relief, we reverse the superior court's order dismissing their complaint and remand for further proceedings consistent with this opinion.  Both parties request attorneys' fees incurred on appeal under A.R.S. § 12-341.01(A).  Because State Farm has not prevailed on appeal, we deny its request.  In our discretion, we deny the Goldbergers' request for attorneys' fees without prejudice to them requesting appellate fees at the conclusion of the litigation in the superior court.  As the successful party on appeal, the Goldbergers are entitled to taxable costs upon compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED:   AA